## No. 2506
## Second Circuit

## ROBERT S. BOSSIER v. LOUISIANA OIL REFINING CORPORATION

(November 4, 1925, Opinion and Decree)

(December 17, 1925, Rehearing refused with reasons.)

### (Syllabus by the Editor)

1. **Louisiana Digest—Master and Servant —Par. 154.**

Under Section 38 of Act 20 of 1914, the Workmen's Compensation Act, as amended by Act 38 of 1918, a hernia caused by leaning over and throwing pipe at an angle is an accident and, therefore, within the meaning of the Act.

2. **Louisiana Digest—Master and Servant —Par. 160 (a).**

The refusal of an injured employee under the Workmen's Compensation Act No. 20 of 1914 to submit to an operation for hernia may not be so unreasonable as to bar him from recovery under the Act, the evidence showing that the operation will not necessarily cure the patient and that there is danger that it may prove fatal attached to it.

3. **Louisiana Digest—Master and Servant —Par. 160 (k).**

Under the provisions of the Workmen's Compensation Act No. 20 of 1914, Section 21, Subsection 2, and Act 214 of 1906, a contract between an injured employee and his attorney by which the attorney is to receive one-third of the amount recovered is not unreasonable.

Appeal from the First Judicial District Court of Louisiana, Parish of Caddo. Hon. J. H. Stephens, Judge.

This is a suit brought by an injured employee for compensation under the Workmen's Compensation Act No. 20 of 1914.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

Long & Crow, of Shreveport, attorneys for plaintiff, appellee.

Blanchard, Goldstein & Walker, of Shreveport, attorneys for defendant, appellant.

## STATEMENT OF THE CASE

REYNOLDS, J. This is an action under the Workmen's Compensation Law of Louisiana to recover $20.00 per week for 400 weeks, beginning March 14, 1925, for an injury to plaintiff's left side resulting in a left inguinal hernia, alleged to have been received while plaintiff was assisting in lifting a drill stem, arising out of and incidental to his employment by defendant. Plaintiff also asks that his contract with his attorneys, Long & Crow, whereby they are to receive one-third of whatever sum may be recovered in the suit, be approved by the court.

Defendant denied liability on the ground that the injury complained of was not the result of an accident within the meaning of Subsection 1 of Section 38 of the Workmen's Compensation Act.

In the alternative, they allege that the injury could easily be corrected by a minor operation, simple, safe and certain, and that plaintiff's continuing disability resulted not from the injury but from his own willful, unreasonable refusal to submit to an operation.

It also alleges that the contract between plaintiff and his attorneys is contrary to the provisions of the Workmen's Compensation Law and public policy, and is illegal, null and void.

On these issues the case was tried and there was judgment in favor of the plaintiff for compensation at the rate of $12.28· per week for 300 weeks, with the first payment decreed due March 14, 1925, with 5 per cent per annum interest on each payment from its maturity until paid, and the contract between plaintiff and his attorneys was approved.

From this judgment defendant appealed.

## ON THE QUESTION THAT THE INJURY COMPLAINED OF WAS NOT AN ACCIDENT

Plaintiff testified (Evidence, page 2):

"Q. Had to help on the floor? Well, what happened to you on or about the 6th day of March, 1925?

"A. Got a hernia.

"Q. Hernia? Just state to the court how that injury was sustained by you?

"A. Well, I was—we were breaking down the drill pipe; me and another fellow was shoving it out to be racked and while that was going on I felt a little hurting, and then the next day it arrived bad.

"Q. Which side?

"A. Left side.

"Q. In what part of your body?

"A. Well, the lower part, I guess you would call it.

"Q. Near the groin?

"A. Yes, sir.

"Q. Left groin?

"A. Yes, sir.

"Q. What kind of pain was it?

(Page 3)

"A. Well, it was a sharp pain; hurt bad.

"Q. What did you notice that night or next morning?

"A. It was a little knot. And then the next day it come a big one, and I went down to the doctor.

"Q. Well, how did it affect you the next day?

"A. .Well, it was just a big knot came down. It pained me awful.

"Q. Did it come down into your scrotum or back (sack)?

"A. Yes, sir.

"Q. What kind of injury or trouble had you had before that, if any?

"A. Not any kind—no kind.

"Q. There had never been anything the matter with you before?

"A. No, sir.

"Q. What was the approximate weight of these pipes which you were lifting? Throwing?

"A. I don't know exactly, but three hundred (300) or four hundred (400) pounds. About fifteen (15) pounds to the foot.

"Q. What kind of position did you have to get into to handle that pipe?

"A. Stooped over, shoving like this. (Witness demonstrating.)

"Q. Kind of threw it at an angle?

"A. Yes, sir.

"Q. Twisted the body kind of?

"A. Yes, sir."

From this evidence and under the authority of W. M. McMullen vs. Louisiana Central Lumber Co., 2 La. App. 773, and 3 La. App. 562, we think the injury suffered by plaintiff was accidental within the meaning of the compensation act.

## SHOULD PLAINTIFF SUBMIT TO AN OPERATION?

Defendant contends·that it is unreasonable for plaintiff to refuse to submit to an operation for hernia that would almost certainly result in a permanent cure with but slight possibility of death or damage resulting from the operation, and that he

cannot recover compensation for a condition that he voluntarily continues.

Doctors G. H. Cassity, T. E. Williams, S. W. Boyce and E. L. Sanderson testified as to the effect of an operation for hernia. Doctor Cassity testified, page 13 of the evidence:

"Q. What did you find? What was the result of your examination?

"A. I find that he has a large left oblique inguinal hernia.

"Q. What do you mean by a large hernia?

"A. The opening that the hernia comes through is what we would call large. It is a little less than a half-dollar in size; between the size of a quarter and a half-dollar. In other words, it allows the intestine readily to come down into the scrotum. I found it in that situation when he came to me for examination; the intestine was entirely outside of the abdomen and down in the scrotum.

"Q. State whether or not such a condition is serious and painful, doctor.

"A. The condition is painful to a certain extent all the time when a man is on his feet.

"Q. What about doing heavy work—straining work; what effect would that have on him?

"A. It would increase the suffering.

\* \* \* \*

"Q. Will, or not, that condition be permanent, doctor, without an operation?

"A. The condition will be absolutely permanent without an operation.

"Q. Will it grow worse or less serious in your opinion?

"A. It will grow worse.

"Q. Well, what about the probability of an entire cure or the complete success of an operation?

"A. Well, the chance for a complete cure is fair; it is not absolute.

"Q. Well, will you state whether or not, in your knowledge and opinion, there are fatalities from operations for hernia of this nature?

"A. There are.

"Q. What about administering an anaesthetic in a case like that?

"A. Well, an anaesthetic is generally used though not absolutely necessary. It can be operated on with local anaesthesia. The hazard of infection, in my judgment, is increased in operating for hernia of that size with local anaesthesia."

Doctor T. E. Williams testified, page 20 of the evidence:

"Q. What is the remedy, doctor, usually recognized by the medical profession for hernia?

"A. The conservative treatment is trusses; the radical treatment is operation.

"Q. What is the cure usually suggested by physicians and surgeons?

"A. The operation.

"Q. Is that operation safe, doctor?

"A. Comparatively safe.

\* \* \* \*

(Page 21)

"Q. Well, just state to the court how you compare it with other operations.

"A. It is a safer operation than most abdominal operations. Yes, sir.

"Q. Is the cure certain, doctor?

"A. In most instances.

"Q. In most instances? Suppose that a man does not have an operation for hernia what dangers does he undergo?

"A. Possible strangulation.

"Q. What is that?

"A. Strangulation? Part of the intestine slipping out from the opening and becoming constricted.

"Q. Is that likely to occur or not likely to occur?

"A. Occurs rather frequently.

"Q. Does it require serious strain to bring that about or slight strain?

"A. Sometimes a slight strain will do it.

"Q. Even to a man who is not engaged in strenuous work?

"A. Yes, sir.

"Q. Doctor, is this strangulation serious or dangerous?

"A. Yes.

"Q. Is it fatal?

"A. If not attended to immediately it is.

"Q. How can that be attended to, doctor?

"A. Operation.

"Q. That is the only thing that can be done?

"A. You can get temporary relief by reducing it, but the only thing to prevent it recurring again is an operation. The truss is temporary.

"Q. That is merely temporary relief?

"A. Yes, sir.

"Q. How would you compare, from your experience, the dangers from strangulation and the dangers from an operation for hernia? Would the fatalities be more from strangulation or from an operation?

"A. More danger from strangulation.

"Q. Is the operation for hernia any more painful or does it cause any more suffering than the average operation, doctor?

"A. Less than most operations of the abdomen.

\* \* \* \*

"Q. If a man is in reasonably sound health, and is young, what would you say of the probabilities of success in the case of an operation for hernia?

"A. It ought to be one hundred per cent.

\* \* \* \*

"Q. Is it possible, doctor, for a man to wear a brace or truss all the time in a case like this?

"A. All the time.

"Q. Yes?

"A. Yes, sir.

"Q. Does that prevent strangulation?

"A. It will, in most instances, as long as you wear it.

"Q. Is it possible for strangulation to occur when a man is doing heavy work, even though he had a truss on?

"A. It is possible, yes.

\* \* \* \*

"Q. Will you state to the court the nature of an operation for hernia and what has to be done in remedying the defect— remedying the injury? Just what does the surgeon do?

"A. In the normal condition of a man's body there are small openings in the lower part of the abdomen known as the inguinal rings, through which the spermatic cord passes, and a hernia is an enlargement of these rings. An operation consists of an incision over those rings through the parts down through the abdominal wall, overlapping and sewing the different layers so as to prevent a recurrence of the enlargement of those rings.

\* \* \* \*

"Q. Now, doctor, you know of young, healthy, able-bodied men dying from being operated on for hernia, do you not? Strong as a mule, and that is as strong as a man can get, being operated on for nothing in the world but hernia, dying?

"A. I cannot say that I do. I cannot remember an instance.

"Q. You do not remember an instance like that? People operated on for hernia, good, able-bodied, strong people?

"A. I don't remember any.

"Q. You do not remember any? I will dig you up some names. It is possible, though, for them to die, is it not, from hernia?

"A. Other circumstances. Not as a consequence of the operation.

"Q. Well, I do not know what you would call it.

"A. Not from the operation.

"Q. I asked you if a man, an able-bodied man, does not quite often die when operated on for hernia?

"A. They die after being operated on for hernia.

"Q. Well, there is a chance for a man to lose his life—that is all I mean.

"A. There is always a chance for a man to lose his life.

"Q. All right.

"A. In crossing the street you take a chance of losing your life.

"Q. Is there not a greater, chance of one losing his life in being operated on for hernia than in crossing the street?

"A. Probably so.

"Q. Is there not a much greater chance of losing one's life in being operated on for hernia than in crossing the street?

"A. I do not think a great deal.

"Q. Is not there a chance of the spermatic cord being tied and for a man to lose his sexual powers in being operated on for hernia?

"A. Well ——

"Q. You do not know that we had one operated on under the eye of the court—James A. Kenner—operated on at the Highland Sanitarium?

"A. That occurs occasionally.

\* \* \* \*

"Q. It is not a simple operation, is it, doctor?

"A. We consider it a fairly simple operation, yes, sir.

"Q. What?

"A. We consider it one of the simple operations of the abdomen.

\* \* \* \*

"Q. Doctor, is it just as easy to keep a deadened tissue clean as a live one?

"A. I will modify my response to Mr. Long's question. The case I had in mind

died following an operation for hernia. The operation was not the direct cause of the death, it was probably the indirect cause of death. The case I refer to was strangulation and the patient had to take a general anaesthetic, and as a result contracted—she had a bad tubercular condition of the chest—and the anaesthetic gave her pneumonia from which she died.

* * * *

"Q. Do you remember of having read of some case, besides that, in your study of medicine, that did die from the effect of or from an operation for hernia, directly or indirectly, from hernia, besides that one, in all of your lifetime?

"A. I think there are a good many cases I do not recall."

Doctor S. W. Boyce testified, page 31 of the evidence:

"Q. What was your advice to Mr. Bossier?

"A. I examined him and advised him to have an operation to correct this condition.

* * * *

(Page 32)

"Q. What would you say of the possibility of success and the certainty of cure in cases of operation for hernia?

"A. From my observation and experience —from my experience— it is one hundred per cent. From my observation it is probably ninety-six or ninety-seven per cent.

(Page 33)

"Q. Is the danger of strangulation in the event that an operation is not had very large?

"A. In a hernia of this size—in a man of his age and the kind of work that he does—it is ninety-nine per cent certain.

* * * *

"Q. That was a rather large hernia?

"A. Yes, sir.

* * * *

"Q. Now, when the Louisiana Oil Refining Corporation offered this operation to Mr. Bossier, did they offer the services of a competent and successful surgeon?

"A. Yes, sir.

* * * *

"Q. Dr. Hendrick is a reputable physician?

"A. Yes, sir.

"Q. If he makes a mistake in a hernia anybody else is likely to make one?

"A. We all make mistakes.

(Page 40)

"Q. All right. Now a man goes on the table for hernia and there is no absolute guarantee that he is either going to be cured or that he is coming off alive—is there, doctor?

"A. None at all.

(Page 42)

"Q. Then, doctor, I misunderstood you. In other words, complications can arise from hernia?

"A. Not the operation.

"Q. And death would be due to the complication?

"A. Yes, sir."

Doctor E. L. Sanderson testified, page 49 of the evidence:

"Q. Doctor, I will ask you if, as a practitioner, you are acquainted with the operation called an operation for hernia or rupture?

"A. Yes, sir.

"Q. I will ask you to state whether or not the operation requires as great or greater skill on the part of the surgeon than an operation for appendicitis?

"A. Yes, sir, it does.

* * * *

"Q. I will ask you, doctor, if there are ever such things as unsuccessful operations for hernia—either that cause constrictions of the cord or other inflammations or even death?

"A. There are.

(Page 50)

"Q. Would you or would you not advise an operation for hernia?

"A. I would.

"Q. Would you advise it if there were no question of compensation or the compensation act involved; would you advise it to a man in the ordinary walk of life just for his own protection?

"A. I would.

(Page 51)

"Q. Do you use a local anaesthetic for this kind of an operation?

"A. About, I should say, one-third of the time.

(Page 52)

"Q. Just one moment! In your observation, generally, what per cent of the hernia operations are successful and produce a cure?

"A. No definite authorities are given, definite statistics on that; but my personal observation is that—of course, this is more or less of a guess—but it is that about one out of twenty come back.

"Q. One out of twenty?

(Page 53)

"A. I should think that is a pretty fair estimate.

"Q. Ninety-five per cent are cured?

"A. No—Well, I just don't know what.

"Q. (Interrupting) What percentage it is, but you should say that nineteen out of twenty are satisfactorily cured?

"A. I believe so.

\* \* \* \*

"Q. Doctor, one question. There are people, though, who die from operations for both hernia and appendicitis?

"A. Sure."

Under this evidence as a whole and under the authority of A. A. Addison vs. Powell Lumber Co., 1 La. App. 210,, the syllabus of which reads as follows:

"Where an employee is injured, under the Employers' Liability Act No. 20 of 1914, the employee is entitled to compensation even though he refuses to undergo an operation for hernia, the evidence showing that it will likely cure him, but the success of the operation cannot be guaranteed, a small per cent being not benefited and one-half of one per cent being fatal."

This court is not prepared to hold that plaintiff's refusal to be operated on for hernia was so unreasonable as to bar him from recovery under the Workmen's Compensation Act.

## ON THE PROPOSITION THAT THE CONTRACT BETWEEN PLAINTIFF AND HIS ATTORNEYS IS ILLEGAL

This court has recently held in the case of Matthew Burton vs. Kaucher, Hodges & Co., 3 La. App. 74 (herein), and this day decided, a similar contract to that here in question, to be valid under the provisions of Act 124 of 1906 and Paragraph 2 of Section 21 of the Workmen's Compensation Act.

For the reasons assigned it is ordered, adjudged and decreed that the judgment appealed from be affirmed.

---

## ON APPLICATION FOR REHEARING

ODOM, J. The issues in this case have been narrowed down to one, to-wit: Is the plaintiff unreasonably refusing to undergo an operation for hernia?

We have held that, under the circumstances of this case, his refusal to submit to an operation is not unreasonable. This is as far as we have gone.

Counsel for defendant have submitted a long list of authorities from other jurisdictions holding that under some circumstances an injured employee must forego compensation if he refuses an operation.

In the case at bar, we do not pretend to decide that question.

But what we did hold was that the plaintiff, under the testimony, was not unreasonable in his refusal to submit to the proposed operation.

There were four physicians called as witnesses in the case: Doctors Cassity, Williams, Boyce and Sanderson.

Doctor Cassity said that the chances for a complete cure by an operation were fair but not absolute; that sometimes there are fatalities attending such operations; that an anaesthesia is generally used though not absolutely necessary; that an operation can be performed with local anaesthesia, but that the hazard of infection is

increased by operating with a local anaesthetic.

Doctor Williams testified that the conservative treatment for hernia of plaintiff's kind is a truss, "the radical treatment is operation"; that physicians advised operations; and on being asked if that operation is safe, replied: "Comparatively so."

He said that such an operation is safer than most abdominal operations; that the cure "in most instances" is certain; that an operation for hernia brings on less pain and suffering than most operations on the abdomen. He said if a man is young and sound in health his chances for recovery "ought to be one hundred per cent".

He was asked if there was a chance for a man to lose his sexual powers from an operation for hernia, and he said "that occurs occasionally".

He said it was a fairly simple operation and that doctors considered it a simple operation of the abdomen. He was asked if he had not read of deaths from the operation, and he said: "I think there are a good many cases; I do not recall."

Doctor Boyce advised plaintiff to undergo the operation. As to the probability of the success of such an operation, he said that his experience showed one hundred per cent success, but that from his observation probably ninety-six or ninety-seven per cent were cured, and that for a man of plaintiff's age it should be ninety-nine per cent, but that when a man submits to such an operation there can be uncertainty of cure and that death could occur from complications.

Doctor E. L. Sanderson testified that the operation required greater skill than an operation for appendicitis; that there were unsuccessful operations for hernia; that he advised such operations; that in one-third of such operations he used local anaesthesia; and that one out of twenty operations of the kind are failures and that some such operations prove fatal.

It will thus be seen that three of the four physicians testified that some such operations prove fatal. One says that the chances for recovery are fair. One says they should be one hundred per cent safe, but he does not say they are. None of them say it is a simple operation but say it is a "simple abdominal operation"; and one says it is "comparatively safe". One says that complications may arise producing fatal results, and one says that there are cases where men lose their sexual powers as a result of such operation.

From this testimony we cannot say the operation is "simple and unattended by risk".

In the case of Bronson vs. Harris Ice Cream Co., *supra*, the surgeons advised that the operation would not be dangerous to life or health and that the chances for complete success, in which event the limb would be completely restored, and of non success, in which event the limb would be ankylosed and rigid, were about even; but in that case, according to the advice of the surgeons, there was no danger to life or health; and yet the court held that the plaintiff's refusal to submit to the operation was not unreasonable.

The court cannot say that in order for plaintiff to get compensation he must take a chance on losing his life, however slight that chance may be.

Counsel say in brief that our ruling is contrary to the holding in the Bronson case. On the contrary, we are following that case, as we understand it.

Rehearing refused.